# United States Court of Appeals
## for the Second Circuit

August Term 2024
Argued: February 13, 2025
Decided: August 22, 2025

No. 24-776-cv

WILDLIFE PRESERVES, INC.,

*Plaintiff-Appellant*,

*v.*

ALEXCY ROMERO, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF
FIRE ISLAND NATIONAL SEASHORE, AND THE NATIONAL PARK SERVICE,
AN AGENCY OF THE U.S. DEPARTMENT OF THE INTERIOR, UNITED
STATES OF AMERICA,

*Defendants-Appellees.**

---

* The Clerk of Court is directed to amend the caption as set forth above.

Appeal from the United States District Court
for the Eastern District of New York
No. 2:17-cv-6952, Ramón E. Reyes, Jr., *Judge*.

Before:           PARK, PÉREZ, and NATHAN, *Circuit Judge*s.

This lawsuit concerns the future of the Sunken Forest Preserve, a globally rare maritime holly forest located off the coast of Long Island, New York. In the 1950s and 1960s, by way of two deeds, Plaintiff-Appellant Wildlife Preserves, Inc., conveyed a substantial portion of the Sunken Forest to the United States government. But the conveyance was subject to certain limitations: the land was required to be maintained in its natural state and operated as a preserve for the maintenance of wildlife. The tract has since been managed by the National Park Service and is part of the much larger Fire Island National Seashore.

In 2016, after decades of studying the rapid growth of white-tailed deer populations throughout the National Seashore, the government concluded that heavy deer browsing posed a threat to local flora and fauna. In response, it published a "Deer and Vegetation Management Plan," which authorized the construction of fencing to exclude deer from most of the Sunken Forest and allowed for both lethal and nonlethal methods to reduce deer density.

Wildlife Preserves soon filed this quiet title action, arguing that the 2016 Plan violates the terms of the deed restrictions. The United

2

States District Court for the Eastern District of New York (Ramón E. Reyes, Jr., *J.*) denied Plaintiff's motion for summary judgment and granted the government's cross-motion for summary judgment. Because the Plan does not violate the deed restrictions as interpreted under New York law, we **AFFIRM** the judgment of the district court.

Judge Park concurs in a separate opinion. Judge Pérez concurs in part and dissents in part in a separate opinion.

————

CATHERINE PASTRIKOS KELLY, Meyner & Landis, LLP, Newark, NJ, *for Plaintiff-Appellant*.

JAMES H. KNAPP (Varuni Nelson, *on the brief*), Assistant United States Attorneys, *for* Breon Peace, United States Attorney for the Eastern District of New York, Central Islip, NY, *for Defendants-Appellees*.

————

NATHAN, *Circuit Judge*:

When visitors enter the Sunken Forest—a 44-acre old-growth maritime holly forest nestled within the 19,600-acre Fire Island National Seashore—they are greeted by a small plaque affixed to a large rock.

3

A primeval holly forest: A sanctuary for wildlife: A field for study by scientist and lover of nature, a retreat for the refreshment of the human spirit. Enter here to enjoy, but not to injure and destroy.

Fire Island Nat'l Seashore (@fireislandnps), Instagram (July 5, 2024), https://perma.cc/S5D8-CJQC.

The parties to this lawsuit, a conservation group and the National Park Service, agree that the Sunken Forest must be maintained as a nature preserve. But they have competing visions for how best to do so.

In 2016, the National Park Service finalized its "White-Tailed Deer Management Plan" for the Fire Island National Seashore, a 26-mile stretch of land within the national park system. After decades of studying the proliferation of white-tailed deer, who have no natural predators, the government determined that heavy deer browsing posed a threat to flora and fauna throughout the Seashore. Accordingly, the 2016 Plan proposes various steps to "reduce and maintain deer density at a target level of approximately 20-25 deer per square mile." App'x at 112. In the Sunken Forest, the 2016 Plan calls for the construction of exclusion fencing and the use of sharpshooting and other methods of "direct reduction" to achieve a "deer density of zero" within the fenced zone. *Id.*

In 2017, Plaintiff-Appellant Wildlife Preserves, Inc., a non-profit land conservation corporation, filed suit. The organization had donated a substantial portion of the Sunken Forest in the 1950s, and by the 1960s the National Park Service possessed the property. But Plaintiff's conveyance was subject to certain restrictions, requiring the

land to be "maintained in [its] natural state and operated as a preserve for the maintenance of wildlife[.]" App'x at 49. Wildlife Preserves contends that the government's 2016 Plan violated these restrictions, which triggered its own reversionary interest in the property under New York law. It thus brought claims under the Quiet Title Act of 1972, which is the exclusive procedure "to adjudicate a disputed title to real property in which the United States claims an interest[.]" 28 U.S.C. § 2409a(a).

The United States District Court for the Eastern District of New York (Ramón E. Reyes, Jr., *J.*) denied Wildlife Preserves' motion for summary judgment and granted the government's cross-motion for summary judgment, holding that the lawsuit was time-barred due to a 1967 fence that had previously triggered Wildlife Preserves' reversionary interest in the property. *Animal Welfare Inst. v. Romero*, 718 F. Supp. 3d 252, 262–63 (E.D.N.Y. 2024).

We **AFFIRM** the judgment of the district court on the alternative ground that the 2016 Plan does not violate the deed restrictions as interpreted under New York law.

## BACKGROUND

### I.   Factual Background

Wildlife Preserves is a non-profit conservation organization "dedicated to the preservation of natural areas, open space, wildlife, and wildlife habitats for conservation, education, and research." App'x at 18. In 1955, the organization conveyed multiple tracts of property to Sunken Forest Preserve, Inc., a non-party company, via deed. The conveyed land included most of the Sunken Forest

5

Preserve, a primeval holly forest off the coast of Long Island. The 1955 deed had the following conditions:

> This conveyance is made subject to the express condition and limitation that the premises herein conveyed shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population, and for scientific and educational purposes incidental to such maintenance and operation. Should the premises cease to be used solely for the above purposes, or should any activities be engaged thereon that would adversely affect either the flora or the fauna, then the title of the grantee shall cease and determine and shall revert to and vest in the grantor, the said reversion and vesting to be automatic and not requiring any re-entry.

App'x at 49, 61–67.

A decade later, in 1966, the property was conveyed to the United States government via deed. The 1966 deed expressly incorporated the restrictions imposed by the 1955 deed, stating that the conveyance was subject to "[t]he condition, limitation and reverter as contained in" the prior deed. App'x at 81.[1]

---

[1] The 1966 conveyance was also "expressly made subject to" the following, nearly-identical conditions: that the premises "shall always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wild life and its natural habitat, undisturbed by hunting, trapping, fishing or any other activities that might

6

Shortly before the 1966 deed was executed, Congress established the Fire Island National Seashore, which consists of 19,600 acres of protected land "[f]or the purpose of conserving and preserving for the use of future generations certain relatively unspoiled and undeveloped beaches, dunes, and other natural features within Suffolk County, New York[.]" 16 U.S.C.A. § 459e. The Seashore stretches from Robert Moses State Park at its western border to Moriches Inlet at its eastern edge, and it includes Fire Island's seventeen private residential communities, the waters of the Great South Bay, and all of the Sunken Forest Preserve.

Federal law mandates that the government "administer and protect the Fire Island National Seashore with the primary aim of conserving the natural resources located there." 16 U.S.C.A. § 459e-6(a). In particular, "[t]he area known as the Sunken Forest Preserve shall be preserved from bay to ocean in as nearly its present state as possible without developing roads therein, but continuing the present access by those trails . . . to allow visitors to explore and appreciate" the land. *Id.* According to the National Park Service, the Seashore's enabling legislation "specifically call[ed] out the Sunken Forest for protection" because of the "rarity and uniqueness" of its ecosystem. App'x at 485. Indeed, the Sunken Forest, which contains holly specimens over three centuries old, is the rarest ecosystem within the Seashore and one of only two maritime holly forests in the United States.

Since 1966, the National Park Service has maintained the

_____

adversely affect the environment or the flora or fauna of said premises; and for scientific and educational purposes incidental to such maintenance and operation." App'x at 77.

Sunken Forest as a nature preserve and monitored the health of its ecosystem. Over the past three decades, the government has also observed and documented a notable increase in white-tailed deer throughout the Seashore, which has produced "severe negative impacts on vegetation . . . and an increase in undesirable human-deer interactions." App'x at 367. Although very few deer occupied the land prior to the 1960s, the white-tailed deer population has grown rapidly in recent years due to the lack of natural predators and the availability of artificial food sources from Fire Island's residential communities. Within the Sunken Forest, government researchers have documented a decline in plant density due to heavy deer browsing. In fact, some plant species "have dramatically declined in abundance or have been altogether extirpated from the area by deer browse[.]" App'x at 485.

Animals are also impacted. The government estimates that the decline of vegetation density from continued deer browsing will "have long-lasting adverse effects" on animal life throughout the Seashore, such as a reduction in vegetation-dwelling insects and "shrub nesting and foraging use by songbirds," App'x at 554, as well as impacts on small mammals and reptiles, App'x at 555. In the Sunken Forest specifically, the government predicts that excluding deer from the land would result in "[v]egetation recovery to herbs, forbs, shrubs, and tree saplings" and positively impact "ground and shrub nesting songbirds, insects reliant upon vegetation for their life cycle, and mammalian herbivores." App'x at 556.

To address the threat of heavy deer browsing, the government unveiled the "White-Tailed Deer Management Plan." In 2014,

8

pursuant to the to the National Environmental Policy Act of 1969, the National Park Service published a draft environmental impact statement for the Plan in the Federal Register. After a period of public comment, it issued a Record of Decision, and the Plan became final in 2016.

The 2016 Plan will impact the Sunken Forest in two ways.

First, the Plan calls for the construction of exclusion fencing "to protect the majority of the rare maritime holly forest from deer browse." App'x at 125. Approximately 29 acres of exclusion fence will be built within the Sunken Forest Preserve, and 15 additional acres of fenced land will extend to the east. The fencing will be eight-to-ten-feet high but will include a "mesh size . . . sufficient to allow most small animals to move freely through" it. App'x at 125. Moreover, the exact location of the fence "will be dictated by minimizing environmental impacts," and, during construction, the government will collect desirable herbs and shrubs and replant them "within the area of disturbance." App'x at 125–26.

Second, the Plan provides for "a combination of lethal and nonlethal actions to reduce and maintain deer density" throughout the Seashore. App'x at 112. Although the overall target density will be 20-to-25 deer per square mile, the Plan aims for zero deer within the Sunken Forest's fenced area.[2] To accomplish this goal, "deer will be removed from the fenced area by driving them out" as the fence is being constructed. App'x at 126. Once the fence is completed,

---

[2] The government's most recent survey, in 2014, estimates that between 21 and 36 deer occupy the "Sailors Haven-Sunken Forest" region (or 112 deer per square mile). App'x at 137. The study found that "even a small number of deer" in the Sunken Forest can "do a great deal of harm, especially to the herbaceous layer[.]" App'x at 137.

however, "any deer found inside the fence will be removed through direct reduction (sharpshooting or capture and euthanasia)." App'x at 126. The Plan does not allow for any public hunting or trapping within the Sunken Forest.

Ultimately, the 2016 Plan's objective for the Sunken Forest is to "maintain the character of the globally rare maritime holly forest . . . by fostering the regeneration of key canopy constituent tree species" and other flora. App'x at 110. As the government has found, "[a]t current levels, deer browsing in the Sunken Forest . . . is reducing the abundance and diversity of native vegetation, including important understory species." App'x at 97. The Plan also seeks to protect animals that rely on this vegetation for sustenance and shelter, such as ground-nesting birds and small mammals.

## II.     Procedural Background

In 2017, Wildlife Preserves and co-plaintiff Animal Welfare Institute filed suit in the Eastern District of New York, alleging that the Plan violated the terms of the 1955 and 1966 deeds, that title to the conveyed property had reverted to Wildlife Preserves upon its enactment, and that the court should permanently enjoin the government from fully implementing the Plan. After Plaintiffs filed an amended complaint to add claims under the Quiet Title Act, the district court dismissed these claims "for failure to name the United States as a party" but granted leave to amend. *Animal Welfare Inst. v. Romero*, No. 17CV6952SJFARL, 2020 WL 4451926, at *9 (E.D.N.Y. Aug.

10

3, 2020).[3]

In a second amended complaint, the now-operative complaint, Plaintiffs seek title under the Quiet Title Act along with declaratory relief, injunctive relief, and ejectment. After discovery, the district court denied Wildlife Preserves' motion for summary judgment and granted the government's cross-motion for summary judgment. *Animal Welfare Inst.*, 718 F. Supp. 3d at 262–63 (E.D.N.Y. 2024).[4] It held that the suit was time-barred by the Quiet Title Act's twelve-year statute of limitations because in 1967, the government had built a fence around the conveyed property, but Wildlife Preserves failed to bring suit within twelve years after it "knew or should have known" that their quiet title claim had accrued. *Id.* at 267. The court further held that Plaintiff could not "resurrect a time-barred . . . claim involving the same disputed title" based on the 2016 Plan. *Id.*

This appeal followed.

## DISCUSSION

"We review the district court's ruling on cross-motions for summary judgment *de novo*, in each case construing the evidence in the light most favorable to the non-moving party." *Friends of Animals*

---

[3] In 2020, in a separate lawsuit, the Second Circuit held that the National Park Service complied with the requirements of the National Environmental Policy Act when developing and approving the 2016 Plan. *Friends of Animals v. Romero*, 948 F.3d 579, 588 (2d Cir. 2020) (concluding that "it is abundantly clear that [the government] took a hard look at the environmental consequences of the Plan").

[4] The court also found that co-plaintiff Animal Welfare Institute was not a proper party to Wildlife Preserves' quiet title action. *Animal Welfare Inst.*, 718 F. Supp. 3d 252, 263 n.8 (E.D.N.Y. 2024). This determination is not before us, and Animal Welfare Institute is not a party to this appeal.

11

*v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020). "Summary judgment is proper where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "This Court is free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998) (quotation marks omitted).

## I.     Ripeness

As an initial matter, this controversy is ripe for judicial consideration.

"To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quotation marks omitted). "[D]etermining whether a dispute is ripe for review requires a two-pronged analysis of (1) whether the issues presented . . . are fit for review, and (2) what hardship the parties will suffer in the absence of review." *Connecticut v. Duncan*, 612 F.3d 107, 113 (2d Cir. 2010).[5]

*First*, Wildlife Preserves' challenge to the government's 2016

---

[5] Although the concurrence contends that this test "analyzes prudential ripeness, which is a separate doctrine from constitutional ripeness," *infra* at 1 n.1, our case law makes clear that "[t]he two-step inquiry is relevant for both constitutional and prudential ripeness analysis," *N.Y. C.L. Union v. Grandeau*, 528 F.3d 122, 132 n.9 (2d Cir. 2008). In any event, as discussed below, this dispute is constitutionally ripe because it presents a "concrete dispute affecting cognizable current concerns of the parties," *id.* at 131, and is thus not "premature for review," *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 149 (2d Cir. 2021) (quotation marks omitted).

Plan is fit for judicial review. As part of the fitness inquiry, we have "dr[awn] a distinction between pre-enforcement judicial review of 'specific regulations' promulgated by [an] agency and judicial review of a nonfinal proposed policy." *N.Y. C.L. Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008). This distinction allows courts to review formal administrative decisions without "entangling themselves in abstract disagreements over administrative policies[.]" *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). In *Isaacs v. Bowen*, for example, we held that a challenge to a proposed policy change to Medicare was unripe because the policy in question was "not at a concrete plan" and had not "been formally promulgated[.]" 865 F.2d 468, 477 (2d Cir. 1989). But agency actions that are "promulgated in a formal manner after announcement in the Federal Register and consideration of comments by interested parties," *Abbott Lab'ys*, 387 U.S. at 151, may be "appropriately the subject of attack[,]" *id.* at 150 (quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 419 (1942)). This is especially the case where "the issue tendered is a purely legal one" and there is "no claim . . . that further administrative proceedings are contemplated." *Id.* at 149.

Here, after a public comment period, the National Park Service published in the Federal Register a Notice of Availability of the challenged Plan in late 2015. 80 Fed. Reg. 81856, 81856–57 (Dec. 31, 2015).[6] The government then issued a Record of Decision in April 2016, which formally approved the "White-Tailed Deer Management

---

[6] The Environmental Protection Agency also published in the Federal Register a Notice of Availability of the same Plan. *See* 81 Fed. Reg. 936-01 (Jan. 8, 2016).

Plan for Fire Island National Seashore." App'x at 108, 118. In 2020, this Court upheld the 2016 Plan against an action seeking to "vacate the Record of Decision approving the Plan" under the National Environmental Policy Act. *Friends of Animals*, 948 F.3d at 585. Wildlife Preserves now seeks to permanently enjoin the government from executing the 2016 Plan on its deeded property. The 2016 Plan is thus appropriately the subject of attack because Plaintiff challenges a final administrative action that has been published in the Federal Register, subject to public comment, and formally promulgated, and the dispute itself is "primarily legal rather than factual[.]" *Isaacs*, 865 F.2d at 478; *see Abbott Lab'ys*, 387 U.S. at 149–51.

Moreover, this case does not present an "abstract disagreement," *Walsh*, 714 F.3d at 687, but rather a "concrete dispute between the parties," *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008). The 2016 Plan provides for the construction of 29 acres of exclusion fencing within the Sunken Forest Preserve, and it is uncontested that this fencing will bisect Plaintiff's tracts and destroy vegetation during construction. *See* Appellant's Br. at 40; Appellees' Br. at 36–37.[7] The Plan also calls for sharpshooting and other methods

---

[7] The concurrence maintains that the parties "agree only that the fencing will be installed in the larger Sunken Forest Preserve." *Infra* at 2 n.3. But the government has never represented—on appeal or before the district court—that the proposed fencing will (or even *might*) exclude the deeded property. Instead, the government concedes that the Plan will result in the destruction of "1.31 acres of vegetation" but argues that Seashore staff will minimize harm by "collect[ing] and replant[ing]" vegetation along the fence. Appellees' Br. at 36–37. The government also argues that these actions are consistent with the deed restrictions' requirement "to maintain and operate [t]he Sunken Forest as a preserve for wildlife." *Id.* at 38. If the government intends to build the fence around, rather than through, the deeded land, it has never said so.

of direct reduction to eliminate all deer from the fenced area. While fence construction has been delayed pending resolution of this lawsuit, the government has consistently maintained that it intends to implement the 2016 Plan.[8] Indeed, at oral argument, the government confirmed that the Plan is already underway on parts of the Seashore. Accordingly, this appeal is fit for judicial consideration.

*Second*, as part of the ripeness inquiry, we consider "whether and to what extent the parties will endure hardship if decision is withheld." *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003). "In assessing this possibility of hardship, we ask whether the challenged action creates a direct and immediate dilemma for the parties." *Grandeau*, 528 F.3d at 134 (quotation marks omitted). Here, the parties have demonstrated that they "will suffer hardship by our withholding judicial review." *Id.* In the Quiet Title Act context, "[i]t is of special importance that landowners know with certainty what their rights are[.]" *United States v. Beggerly*, 524 U.S. 38, 49 (1998).[9]

---

[8] In early 2016, for example, Wildlife Preserves sent a letter to the Seashore's Superintendent expressing "grave concern" about the 2016 Plan; the letter urged the government to consider alternative solutions, including nonsurgical reproductive control of the deer population along with "small-scale fencing of special-status plants." App'x at 2086. The government rejected this proposal, explaining that fertility control would not be an "effective means to protect the ecosystem" and that the planned fence was "a critical element of [the 2016] Plan that will help ensure the long-term preservation and protection" of the Sunken Forest. App'x at 90. Since then, the government has not shifted from its intention to implement the 2016 Plan.

[9] Our sister circuits have accordingly held that a Quiet Title Act claim accrues "as soon as the United States makes a claim that creates even a cloud on a plaintiff's ownership interest." *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1198 (9th Cir. 2008) (quotation marks omitted); *see Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir. 1991) (same). Indeed, "[t]he government's claim need not be clear and unambiguous. . . . All that is necessary is a reasonable awareness that the

15

Here, the Sunken Forest's present legal status remains unresolved. The government maintains that it continues to hold title subject to a possibility of reverter, while Wildlife Preserves contends that *it* now holds title in fee simple due to the deed's automatic reverter provision. *See Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 277 (1983) (resolving a Quiet Title action where "the United States and North Dakota assert[ed] competing claims to title to certain portions of the bed of the Little Missouri River within North Dakota"). They also disagree as to when Plaintiff's Quiet Title Act claim accrued, when the statute of limitations period began to run, and consequently whether the government is free to implement the 2016 Plan on the deeded land.[10] The parties therefore face a "present detriment" sufficient to constitute hardship, not "[t]he mere possibility of future injury." *Simmonds*, 326 F.3d at 360.

Thus, ripeness poses no barrier to our review and we may proceed to the merits.

---

[g]overnment claims some interest adverse to the plaintiff's." *Kingman Reef Atoll Invs.*, 541 F.3d at 1198 (quotation marks omitted). In *George v. United States*, the Tenth Circuit further noted that a Quiet Title Act claim can accrue "by way of the Federal Register" through agency regulations. 672 F.3d 942, 946 (10th Cir. 2012) (Gorsuch, *J.*) (also noting that "[t]he merits of that claim or assertion of adverse interest are irrelevant. One can be on *notice* of a claim even if that claim lacks any legal *merit*.").

[10] We also note that the Quiet Title Act's twelve-year statute of limitations is not subject to equitable tolling. *United States v. Beggerly*, 524 U.S. 38, 48 (1998). Accordingly, if the limitations clock is indeed ticking, it plainly follows that Plaintiff will "endure hardship if decision is withheld." *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003). *See* 28 U.S.C. § 2409a(g) (providing that a Quiet Title action "accrue[s] on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States"); *George*, 672 F.3d at 944 ("[T]he trigger for starting that twelve-year clock running is an exceedingly light one.").

16

## II.       The Deed Restrictions

On appeal, the parties write at length about whether this action is time-barred under the Quiet Title Act. See 28 U.S.C. § 2409a(g). But we need not, and do not, reach that question. Instead, our analysis is grounded in the gravamen of Plaintiff's claim: whether, as interpreted under New York state law, the 2016 Plan violates the 1955 and 1966 deed restrictions at all. We hold that it does not. Accordingly, we affirm the judgment below on this alternative ground.

### A. Legal Background

In New York, the general rule is that a deed transferring an interest in real property must, "like every other contract[,] '. . . be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law.'" *Loch Sheldrake Assocs. v. Evans*, 306 N.Y. 297, 304 (1954) (quoting N.Y. Real Prop. Law § 240(3)). But despite this general rule, deed restrictions creating a reversionary interest are "strictly construed against the grantor." *O & W Lines, Inc. v. St. John*, 20 N.Y.2d 17, 23 (1967). These restrictions limit a property's free use, so they "are not favored by the law" and must be "clearly expressed." *Lipton v. Bruce*, 1 N.Y.2d 631, 637 (1956). Their meaning must "not . . . be extended beyond the fair import of the language expressed except by necessary implication." *Duryea v. City of New York*, 62 N.Y. 592, 597 (1875). Thus, where an agreement restricting use "is reasonably capable of two constructions, the construction which limits the restriction, rather than the one which extends it, should be adopted." *Single v. Whitmore*, 307 N.Y. 575, 581–82 (1954).

Given this requirement, a reversionary interest is not triggered

17

by a breach of a deed restriction that is "purely technical, and of such an unsubstantial character as to warrant the conclusion that it was not within the purpose or intention of the parties." *Rose v. Hawley*, 141 N.Y. 366, 378 (1894). In other words, "[i]t is not enough to show . . . that the letter of the condition is violated, but it must appear that its true spirit and purpose have been willfully disregarded by the grantee." *Id.*

## B. Analysis

The parties agree that the 1955 and 1966 deeds conveyed land from Wildlife Preserves to the government, and that the government's use of that land is subject to restrictions: namely, the land must be "maintained in [its] natural state" and "operated as a preserve for the maintenance of wildlife." App'x at 49. But they disagree as to whether the 2016 Plan—including its exclusion fencing and deer-reduction strategies—violates these restrictions. Given New York's rule for interpreting reversionary interests, we conclude that it does not.

Wildlife Preserves argues that the exclusion fencing "directly violates" the deed restrictions because it prevents deer and other large fauna from accessing most of the conveyed land. Appellant's Br. at 40. It asserts that the fencing, which "will bisect and enclose the majority of" the property, *id.*, "clearly contradicts the intent of the grantors that the land exist undisturbed in its natural state to serve as a sanctuary and preserve for wildlife," *id.* at 41; *see also* App'x at 59. Plaintiff also submits that the Plan's use of "lethal deer management" on the land violates the restrictions, Appellant's Br. at 37–38, because killing animals will "adversely affect . . . the fauna," *id.* at 34. In

particular, it maintains that the use of "sharpshooting" or "capture and euthanasia" as contemplated by the Plan, App'x at 126, is "expressly forbidden by the deed restrictions, which prohibit 'hunting' and 'trapping' of wildlife," Appellant's Br. at 38. Taken together, Wildlife Preserves appears to argue that the only reasonable interpretation of the deed restrictions requires a finding that the government's Plan triggers its reversionary interest.

We disagree.

In interpreting the meaning of the 1955 and 1966 deeds, we must, of course, begin with the text. *See Mercury Bay Boating Club Inc. v. San Diego Yacht Club*, 76 N.Y.2d 256, 267 (1990). Here, the conveyed lands must be (1) "maintained in their natural state" and (2) "operated as a preserve for" (a) "the maintenance of wildlife and its natural habitat[,] undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population," and (b) "scientific and educational purposes incidental to such maintenance and operation." App'x at 49. The land must "be used solely for the above purposes" and the government must not engage in activities "that would adversely affect either the flora or the fauna." App'x at 49. A reasonable interpretation of this language is that it creates two operative requirements: that the government "maintain" the conveyed land in its natural state and that it "operate" a preserve on that land, with the remaining clauses providing the "purpose[]" of these requirements. App'x at 49.[11]

---

[11] The 1966 deed supports this interpretation, requiring that the premises "shall always be" (1) "maintained in their natural state" and (2) "operated solely as a sanctuary and preserve for" (a) "the maintenance of wild life and its natural habitat, undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the

19

Under this interpretation, the 2016 Plan does not violate the deed restrictions.

First, given the substantial evidence that the proliferation of deer threatens to destroy rare flora and adversely impacts local fauna, the construction of mesh fencing complies with the deed restrictions. After all, white-tailed deer are the "dominant herbivore in the Sunken Forest" and are responsible for the depletion of "important canopy constituents," including American holly. App'x at 407. The government's environmental impact analysis also found that the construction of a fence "to exclude deer from the Sunken Forest" would produce "beneficial impacts" on "wildlife within the fenced areas," including songbirds, insects, and mammalian herbivores. App'x at 556. As such, the use of fencing to protect rare, old-growth maritime holly aligns with the government's mandate to "maintain[] [the Sunken Forest] in [its] natural state and operate[] [it] as a preserve for the maintenance of wildlife." App'x at 49.

Wildlife Preserves does not challenge the government's research or factual findings. Instead, it asks us to interpret the deed restrictions as entirely prohibiting the use of a fence because its construction will remove "approximately 1.31 acres of vegetation" and will prevent deer from accessing the fenced land. Appellant's Br. at 40. Yet Plaintiff fully concedes that the construction of a 1.25-mile boardwalk on the land in the 1970s "did not violate the restrictions because its purpose was to protect the [t]racts to benefit flora and fauna by restricting visitors." Reply Br. at 12 n.6. So too here.

flora or fauna of said premises" and (b) "scientific and educational purposes incidental to such maintenance and operation." App'x at 77.

20

Moreover, given that the fencing will bisect (rather than fully enclose) the conveyed property, the 2016 Plan does not exclude *any* species from the land wholesale. And we decline to hold that the *only* reasonable interpretation of the relevant language prohibits a landowner from separating one species from another in order to protect or preserve wildlife. *See Single*, 307 N.Y. at 581; *Lipton*, 1 N.Y.2d at 637.

Second, a reasonable interpretation of the deed restrictions permits the limited culling of deer in certain circumstances. The 2016 Plan calls for deer to be driven out of the fenced area during the fence's construction. If any deer remain after the fence is completed, however, the Plan authorizes targeted sharpshooting as well as capture and euthanasia to remove the remaining fenced population. Plaintiff argues that these techniques violate the deed's prohibition on "hunting" and "trapping." App'x at 49. Not necessarily. "Hunting" and "trapping" could reasonably be defined as the pursuit of game for food, recreation, or commercial purposes, which the Plan prohibits.[12] Plaintiff also contends that the death of even a single deer

---

[12] Merriam-Webster defines "hunt" as "to pursue for food or in sport," and "to manage in the search for game." *Hunt*, MERIAM-WEBSTER, https://www.merriam-webster.com/dictionary/hunt (last visited Aug. 15, 2025). It also defines "hunting" as "the act of one that hunts . . . *specifically*: the pursuit of game," *Hunting*, MERIAM-WEBSTER, https://www.merriam-webster.com/dictionary/hunting (last visited Aug. 15, 2025), and it defines "game" as "wild animals hunted for sport or food," *Game*, MERIAM-WEBSTER, https://www.merriam-webster.com/dictionary/game (last visited Aug. 15, 2025). Similarly, a "trap" is defined by Merriam-Webster as "a device for taking game or other animals" and "to engage in trapping animals (as for furs)." *Trap*, MERIAM-WEBSTER, https://www.merriam-webster.com/ dictionary/trap (last visited Aug. 15, 2025). Oxford English Dictionary defines "trap" as "[t]o practi[c]e catching wild animals in traps for their furs" and "to set traps for game." *Trap*, OXFORD ENGLISH DICTIONARY,

violates the prohibition on activities that "might adversely affect the . . . animal population" or "the fauna." App'x at 49. But both "population" and "fauna" are collective terms, referring to wildlife as a whole. *See Fauna*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/fauna_n?tab=meaning_and_use#45 11664 (last visited Aug. 15, 2025) (defining "fauna" as "[a] collective term for the animals or animal life of any particular region or epoch"). Finally, as our interpretation is guided by New York law, deed restrictions creating a reversionary interest must be "strictly construed against the grantor." *O & W Lines, Inc.*, 20 N.Y.2d at 23. And here, another interpretation exists: while a landowner may not "adversely affect . . . the animal population" as a whole, it *may* adversely affect individual animals if doing so serves its broader obligation to maintain and operate the land "for the maintenance of wildlife." App'x at 49. By this interpretation, the government may take some adverse steps against a single species for the net benefit of the wider ecosystem. Although this is not the only possible interpretation of the deed restrictions, we find that it is a reasonable one.

The dissent prefers a different interpretation—what it calls the "leave the flora and fauna alone" reading. *Infra* at 2. This interpretation, the dissent suggests, creates "symmetry between [the deeds'] clauses" and therefore "make[s] sense." *Id.* at 2–3. But two problems predominate.

---

https://www.oed.com/dictionary/trap_v1?tab=meaning_and_use#17684945 (last visited Aug. 15, 2025).

First, as we have explained, restrictions on land use are "strictly construed against the grantor," *O & W Lines, Inc.*, 20 N.Y.2d at 23; *see also Lipton*, 1 N.Y.2d at 637. Here, Wildlife Preserves acknowledges that it is the grantor of the relevant title and that it imposed the deed restrictions in question. It also seeks to permanently enjoin the government from, among other things, building a fence on the deeded land. But it nonetheless fails to explain why the reverter provision should not be construed in the government's favor.

Second, considering that New York law "favor[s] the free and unobstructed use of realty," *Huggins v. Castle Ests., Inc.*, 36 N.Y.2d 427, 430 (1975), the dissent's preferred interpretation does not comport with the "true spirit and purpose" of the deed restrictions, *Rose*, 141 N.Y. at 378. Indeed, at oral argument, counsel for Wildlife Preserves argued that the relevant language imposed no affirmative requirements. Even if, for example, an arboreal disease threatened to destroy the entire Sunken Forest, counsel argued that the government would be under no obligation to protect the primeval holly. If anything, counsel maintained, prophylactic actions might violate the deed restrictions. This cannot be. Such an interpretation writes out the relevant language: that the land be "maintained in [its] natural state and operated as a preserve for the maintenance of wildlife[.]" App'x at 49. It also produces "absurd" results, "contrary to the reasonable expectations of the parties." *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (2003). By the dissent's logic, the reverter provision was triggered in the 1970s when the government constructed a wooden boardwalk through the Sunken Forest. But neither party advances such a reading. After all, the boardwalk was built to protect

23

flora and fauna from foot traffic, and the resulting harm to any vegetation during construction would, at most, amount to a "purely technical" or "unsubstantial" breach. *Rose*, 141 N.Y. at 378. Thus, as we must not "extend[]" the language of the deeds "beyond the fair import of the language expressed," *Duryea*, 62 N.Y. at 597, the dissent's preferred interpretation is not a reasonable one. *See Baumert v. Malkin*, 235 N.Y. 115, 121 (1922) (rejecting an interpretation that "might result in utter defeat of the only purpose attributable" to the "language used").

Ultimately, because no party disputes that white-tailed deer pose a threat to the Sunken Forest's future as a globally rare maritime holly preserve, we find that the 2016 Plan accords with the requirement that the premises "be maintained in their natural state and operated as a preserve for the maintenance of wildlife." App'x at 49. As we must "strictly construe[]" this language against the party seeking to enforce the restriction, *O & W Lines, Inc.*, 20 N.Y.2d at 23— and because we agree that the Plan is consistent with the "true spirit and purpose" of the reversionary interest, *Rose*, 141 N.Y. at 378—we hold that the 2016 Plan does not violate the deed restrictions.[13] The government is therefore entitled to summary judgment in its favor.[14]

---

[13] In light of this holding, we need not reach the question of whether this action is time-barred under the Quiet Title Act. *See* 28 U.S.C. § 2409a(g).

[14] Although the dissent contends that summary judgment is inappropriate, *see infra* at 7, the government has met its burden to show that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But, here, Wildlife Preserves does not dispute any of the

24

## CONCLUSION

The judgment of the United States District Court for the Eastern District of New York is **AFFIRMED.**

---

government's factual findings.  Nor has the dissent identified any disputed fact that might materially affect our interpretation of the deed restrictions under New York law.

PARK, *Circuit Judge*, concurring:

I agree with Judge Nathan that the proposed Deer Management Plan ("Plan") will not violate the parties' deed restrictions. But in my view, we should not have reached that issue. The Plan has not been implemented, so this case is not constitutionally ripe for review.

**I.**

Wildlife Preserves, Inc. ("WPI") argues that the Plan will violate deed restrictions against adversely affecting the flora or fauna, which will trigger a reversion of the deeded property from the National Park Service ("NPS") to WPI. It relies on the NPS's 2016 "Record of Decision," which anticipates that NPS "will utilize a combination of lethal and nonlethal actions to reduce and maintain deer density," and that a planned deer exclusion fence "will require . . . removal of some vegetation." App'x at 112, 170. WPI says that this proves that the Plan "will adversely affect the . . . flora" and "fauna" in the deeded land, Appellant's Br. at 40 (quotation marks omitted), so it brings this Quiet Title Act ("QTA") claim to assert that it will own the deeded land once the Plan is implemented.

The problem with WPI's claim is that it is not constitutionally ripe because its injury remains "conjectural," not certain or imminent. *See Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 149 (2d Cir. 2021) (citation omitted).[1] First, it is not certain that the Plan will be

---

[1] The majority concludes that this controversy is ripe under the two-pronged analysis in *Connecticut v. Duncan*, 612 F.3d 107, 113 (2d Cir. 2010). But that test analyzes prudential ripeness, *id.* at 113–14, which is a separate doctrine from constitutional ripeness. *See generally Simmonds v. I.N.S.*, 326 F.3d 351, 356–59 (2d Cir. 2003) (contrasting the two). The

implemented. NPS finalized an Environmental Impact Statement ("EIS") for the Plan in 2016, but that does not commit an agency to a course of conduct—it merely assesses a "*proposed* agency action." 42 U.S.C. § 4332(C)(i) (emphasis added).[2] Indeed, the record indicates that since 2016 NPS has not taken any steps to implement the Plan in the Sunken Forest Preserve region. And the text of the Plan is clear that "the extent to which deer management actions will be implemented" is "dependent on available funding and staff." App'x at 111.

Second, even if the Plan is implemented, "it is no more than conjecture" that any deer killing or vegetation removal will occur on the deeded land. *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983). The Plan applies to the entire 20,000-acre Fire Island National Seashore ("FINS"), of which the deeded land is fewer than forty acres—*i.e.*, less than 0.2 percent. While the Plan "approximate[s]" that part of a deer exclusion fence will bisect FINS's Sunken Forest Preserve, App'x at 125,[3] the deeded land is only a "portion" of that

---

majority also claims this case is ripe because the NPS's plan constitutes "final administrative action." *Ante* at 13–14. But finality does not, by itself, render agency action ripe for review. *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) ("[W]e intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an *actual or immediately threatened effect*." (emphasis added)).

[2] *See also Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983) ("[T]he appropriate time for preparing an EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options.").

[3] The exact location of the deer exclusion fence has yet to be determined. *See* App'x at 125 ("The location of the fence will be dictated by minimizing environmental impacts . . . , minimizing structural conflicts . . . , and the potential for long-term bayside shoreline erosion."). Contrary to the majority's assertions, *ante* at 14, the parties do not agree that the fencing will bisect WPI's tracts; they agree only that the fencing will be installed in the larger Sunken Forest Preserve. *See* Appellees' Br. at 36–37.

2

forest, *id.* at 51. So it remains uncertain if and how the Plan will affect the limited slice of land to which the deed restrictions apply. *Cf. Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 736 (1998) (no standing to challenge resource management plan "which predicts consequences that may affect many different parcels of land in a variety of ways").

Ultimately, WPI's "prediction about future injury [is] just that—a prediction." *Trump v. New York*, 592 U.S. 125, 133 (2020). And a "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted).[4]

## II.

At oral argument, WPI switched theories. Instead of arguing that implementing the Plan will violate the deed restrictions, WPI argued that enacting the Plan caused WPI's QTA claim to accrue by creating a dispute about who would own the land if deer killing or vegetation removal occurred. Oral Arg. Tr. at 21–22.

This argument fares no better because the QTA authorizes "bread-and-butter quiet title actions," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 219 n.5 (2012), in which a "plaintiff asserts his own estate and declares generally that

---

[4] It does not matter that this Court upheld the Plan against a NEPA challenge in 2020. *See ante* at 13. A plaintiff "who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737. But the same is not necessarily true for other claims. *See id.* at 732.

[the] defendant claims [a competing] estate in the [same] land," *Action to Quiet Title*, Black's Law Dictionary (4th rev. ed. 1968). For example, a plaintiff says that he owns a reversionary interest, but the defendant claims that his ownership is not subject to any conditions.

The government here is not refusing to acknowledge WPI's reversionary interest. The Plan may imply that the government believes the deed restrictions would not be triggered by deer killing or vegetation removal. But that does not create a dispute about who has title now; it creates a potential dispute about whether title *will* vest. No court has ever found that sort of disagreement to satisfy the "adverse claim" prerequisite to a quiet title action. *See Patchak*, 567 U.S. at 220; *see also* Note, *Enhancing the Marketability of Land: The Suit to Quiet Title*, 68 YALE L.J. 1245, 1265–76 (1959) (describing quiet title actions).

The majority compares this to a case where the government's claim creates "a cloud on a plaintiff's ownership interest." *Ante* at 15 n.9 (quotation marks omitted). But in such a case, the government and the plaintiff are still disputing the *current* status of their ownership. *See Cloud On Title*, Black's Law Dictionary (12th ed. 2024) (defining a "cloud on title" as "a defect or potential defect in the owner's title to a piece of land arising from some claim or encumbrance such as a lien, an easement, or a court order"). By contrast, the dispute here is about what the parties' ownership interests would be in a hypothetical *future*—*i.e.*, a world in which flora

and fauna have been harmed on the deeded land. These two contexts are distinct.[5]

If WPI and the majority were right, property law would look quite different. Consider the rule that a takings claim does not ripen until the government "arrive[s] at a final, definitive position regarding how it will [act with respect] to the particular land in question." *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985); *see also Pakdel v. City of San Francisco*, 594 U.S. 474, 479 (2021) ("This requirement ensures that a plaintiff has actually been injured by the Government's action and is not prematurely suing over a hypothetical harm." (quotation marks omitted)). In the view of WPI and the majority, a plaintiff would not need to wait for such a decision and could sue instead under the QTA, arguing that the government proposal creates a dispute about whether his title precludes the proposed action. But this approach would end-run decades of precedent, "lead[ing] federal courts to issue advisory opinions" about plans that may never come to pass. *Kane Cnty. v. United States*, 772 F.3d 1205, 1212 (10th Cir. 2014).

## III.

WPI says its reversionary interest will be triggered by implementation of the Plan, but the Plan has not been implemented.

---

[5] The majority also cites *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1198 (9th Cir. 2008), which held that the QTA limitations period accrues when a plaintiff has notice of the United States's adverse claim, and *George v. United States*, 672 F.3d 942, 946 (10th Cir. 2012), which held that agency regulations claiming a governmental interest in a plaintiff's property provide notice of an adverse claim. *See ante* at 15 n.9. At most, these cases could be read to suggest that an agency regulation asserting a *present* governmental property interest in a plaintiff's land would make a QTA action ripe. But here, WPI has asserted no *present* adverse interest in the deeded land.

5

Until that happens, WPI has no QTA claim, and in my view, this case is not ripe. But I have been outvoted on this threshold issue, so I join the opinion of Judge Nathan on the merits. *See, e.g.*, *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 189–96 (3d Cir. 2015) (Ambro, J., concurring in part) (discussing voting protocols in multi-issue cases); *Farhane v. United States*, 121 F.4th 353, 403 n.3 (2d Cir. 2024) (Park, J., dissenting).

MYRNA PÉREZ, *Circuit Judge*, concurring in part and dissenting in part:

The majority opinion concludes that sharpshooting and euthanasia of white-tailed deer in the Sunken Forest will not "adversely affect" the fauna there. Majority Op. at 21–22. I'm sure the deer would beg to differ. While I join the balance of the majority opinion, I respectfully dissent from this holding and thus from the judgment. However ecologically sound the White-Tailed Deer Management Plan (the "Plan") may be, the deed simply does not allow deer in the Sunken Forest to be removed by killing them. I would therefore reach the statute-of-limitations and registration issues and vacate the judgment.

I.

The deed restriction contains two clauses—what I'll refer to as the Conditions Clause and the Reversion Clause. The Conditions Clause conveyed the Sunken Forest "subject to the express condition and limitation" that it

> be maintained in [its] natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing, or any other activities that might adversely affect the environment or the animal population, and for scientific and educational purposes incidental to such maintenance and operation.

App'x at 65 (capitalization altered).

1

The Reversion Clause, which immediately follows, describes what happens if that condition is not met:

> Should the premises cease to be used solely for the above purposes, or should any activities be engaged in thereon that would adversely affect either the flora or the fauna, then the title of the grantee shall cease and determine and shall revert to and vest in the grantor, the said reversion and vesting to be automatic and not requiring any re-entry.

*Id.* (capitalization altered).[1]

As the majority opinion suggests, there are different ways to read the obligations imposed by these clauses. One way—call it the "leave the flora and fauna alone" interpretation—reads the duty to "maintain[]" the Sunken Forest "in [its] natural state" as a duty to prevent human activity, such as "hunting, trapping, [and] fishing," from directly harming plants or animals. It imposes no affirmative obligation to eliminate invasive species or otherwise maintain the ecological balance that existed when this covenant was formed in 1955. On this reading, the Reversion Clause perfectly mirrors the Conditions Clause, automatically reverting title if the land is used for some other purpose or if activities "that would adversely affect either the flora or the fauna" take place on the land. This symmetry between

---

[1] Unless otherwise indicated, quotations from the deed are from page 65 of the Appendix, with capitalization altered for readability.

2

clauses would make sense, since one would expect the reversion provision to be triggered by any failure to fulfill the conveyance's "express condition and limitation."

The reading offered in the majority opinion—call it the Spock interpretation[2]—goes in a different direction. On that reading, the duty to "maintain[]" the Sunken Forest "in [its] natural state" includes preventing invasive species, such as white-tailed deer, from damaging the ecosystem as it previously existed, presumably in 1955. Activities "adversely affect either the flora or the fauna," and thus trigger reversion, only insofar as they inhibit that goal. Activities that ultimately keep the ecosystem in its original balance are permitted.

There are a few problems with the Spock interpretation. One is that it puts the Conditions Clause in tension with itself and with the Reversion Clause when an activity "that might adversely affect the environment or the animal population," or "would adversely affect either the flora or the fauna," helps control an invasive species. The majority opinion deals with this conflict by reading "adversely affect" to mean "adversely affect on the whole." But then there's "hunting, trapping, [and] fishing." Those activities are clearly prohibited, even

_____

[2] "[L]ogic clearly dictates that the needs of the many outweigh the needs of the few." *Star Trek II: The Wrath of Khan* (Paramount Pictures 1982).

3

when they only target invasive species, and the majority opinion doesn't dispute that. *See* Majority Op. at 21. Under the Spock interpretation, then, the deed prohibits hunting or trapping a white-tailed deer but not sharpshooting or euthanizing one.[3] That doesn't make sense.

A related problem is that the Spock interpretation would seem to violate the ejusdem generis canon, under which the scope of a general catchall phrase is limited by the more specific words or phrases that precede it. *See, e.g.*, *People v. Illardo*, 48 N.Y.2d 408, 416 (1979).[4] Here, that means that "hunting, trapping, fishing" should, based on what those terms have in common, limit the meaning of "any other activities that might adversely affect the environment or the animal population." What hunting, trapping, and fishing have in common is that they are human activities that cause harm to individual animals. They are not necessarily activities that harm the flora or the fauna on the whole.[5]

---

[3] The majority opinion notes that hunters usually hunt for food or sport, while government sharpshooters don't. *See* Majority Op. at 21–22 & n.12. But the deed seems concerned with the effects on wildlife and the environment, not with the human motivations precipitating those effects.

[4] Scalia and Garner offer an illustration: "Take, for example, a will that gives to a particular devisee 'my furniture, clothes, cooking utensils, housewares, motor vehicles, and all other property.' In the absence of other indication . . . , almost any court will construe the last phrase to include only personalty and not real estate." Antonin Scalia & Bryan A. Garner, *Reading Law* 199 (2012).

[5] In fact, an argument could be made that hunting, trapping, or fishing an animal necessarily benefits the animals or plants that it eats, rarely if ever causing a net harm in a strictly quantitative sense.

4

Instead of deriving its reading of "adversely affect" from context—by applying ejusdem generis or some other method of construction—the majority opinion effectively inserts words into the deed—"on the whole"—in order to avoid a violation of its terms. This breaks the rule of construction, followed in New York and elsewhere, against changing contract terms through creative interpretation. *See, e.g., Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (internal quotation marks omitted)).

*But the Spock interpretation doesn't have to be the best one,* the majority opinion might respond. *It just has to be reasonable.* This brings me to a more fundamental problem with today's holding. The majority opinion relies heavily on the rule that restrictive covenants in New York "are to be construed strictly against the grantor," *Duryea v. City of New York*, 62 N.Y. 592, 597 (1875)—or, perhaps more precisely, against burdening the land, *see Single v. Whitmore*, 307 N.Y. 575, 581–82 (1954) ("[W]here a restrictive agreement is reasonably capable of two constructions, the construction which limits the restriction, rather than the one which extends it, should be adopted."). The problem is that the Spock

5

interpretation construes the burdens on the land broadly, not narrowly.  Under

the Spock interpretation, the duty to "maintain[]" the Sunken Forest "in [its]

natural state" encompasses—and thus *requires*—doing things like culling deer to

protect the ecological balance.  This is a tremendously expansive burden compared

to the "leave the flora and fauna alone" reading.[6]

But even setting all those problems aside—which, combined, render the

Spock interpretation unreasonable[7]—summary judgment for Defendants is not

warranted here.  The plain wording of the deed requires that effects on fauna be

assessed independently from effects on flora: "adversely affect *either* the flora *or*

the fauna" (emphasis added).[8]  Sharpshooting deer must sufficiently benefit *other*

---

[6] It also increases the risk of reversion.  If the grantee fails to do a good job of keeping the ecology in balance, then title automatically reverts.  And there's a case to be made that Defendants have already failed.  The Plan notes that deer began causing "severe negative impacts on vegetation" in "the late 1960s," and that "a substantial decline in the diversity and abundance of key plant species in the Sunken Forest" was recorded by researchers "in the mid-1980s."  App'x at 109.

The majority opinion suggests that the "leave the flora and fauna alone" interpretation would result in reversion in the case of some de minimis harm—including, for example, from building a boardwalk or erecting a fence.  *See* Majority Op. at 23.  But nothing about that interpretation forecloses an exemption for "unsubstantial" or "purely technical" violations.  *Rose v. Hawley*, 141 N.Y. 366, 378 (1894).  It's for that very reason that I join the majority opinion's holding that constructing a fence under the Plan would not violate the deed's terms.

[7] "Although restrictive covenants are construed strictly against the imposer, the intent of the parties is of paramount importance.  Courts insist that the language of covenants be given its natural interpretation and that the construction not be strained."  11 Warren's Weed New York Real Property § 121.20 (footnote omitted); *see also Baumert v. Malkin*, 235 N.Y. 115, 121 (1922) (rejecting a reading of a restrictive covenant that "is narrow and untenable and does not embody the reasonable meaning of the language used").

[8] New York courts interpret the word "or" to indicate an alternative.  *See, e.g., McSweeney v. Bazinet*, 55 N.Y.S.2d 558, 561 (3d Dep't 1945) ("[T]he co-ordinating particle 'or' is used, thus indicating that the language is to be construed in an alternative sense."), *aff'd*, 295 N.Y. 797 (1946); *In re Gerald R.M.*, 785

*animals* in order to justify the adverse effects on the deer. Harms to deer cannot be matched only by benefits to holly or other plants.

The record before us suggests that preventing further loss of vegetation might benefit some birds and small mammals: "The loss of native vegetation and overall change in the vegetation communities *could* result in impacts on other wildlife species, such as groundnesting [sic] birds and small mammals using these areas for food and shelter." App'x at 367 (emphasis added). But it is far from clear that those benefits, should they materialize, would outweigh the adverse effects of killing deer, or that Defendants even expect them to. And to affirm summary judgment on that basis, it must be more than clear—it must be beyond genuine dispute.[9] Even if I accepted the Spock interpretation with all its flaws, I could not conclude that summary judgment for Defendants is appropriate on this record.

---

N.Y.S.2d 256, 258 (4th Dep't 2004) ("[T]he word 'or' as used in a statute is a disjunctive particle [sic] indicating an alternative and it often connects a series of words or propositions presenting a choice of either." (internal quotation marks omitted)).

[9] The majority opinion notes that Plaintiff "does not dispute any of the government's factual findings." Majority Op. at 24 n.14. But a fact must be asserted by the movant before it can form the basis of a summary judgment in their favor. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (holding that even an unopposed summary judgment motion "may . . . fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law" (citation and internal quotation marks omitted)). Here, while Defendants asserted that some benefits to other wildlife might result from the Plan, they did not assert that those benefits would outweigh the harms to the white-tailed deer.

II.

Because I would not affirm based on the merits, I would reach the statute-of-limitations and registration issues.

A.

The Quiet Title Act gives a plaintiff twelve years from the date their claim accrues to file a quiet-title action against the United States. 28 U.S.C. § 2409a(g). An action is "deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." *Id.* Defendants argue that Plaintiff's claim accrued in 1988 at the latest—more than twelve years before filing this action in 2017—when its attorney was given notice, during a hearing in a different but related lawsuit, that a fence had been built around the Sunken Forest. That supposed notice consisted entirely of the following testimony by the Superintendent of the Fire Island National Seashore, who was being questioned by Plaintiff's attorney in that suit:

> Q ... Are you familiar with that particular parcel of land donated in the deed[?]
> A Yes.
> Q Do you know it's [sic] exact boundaries?
> A Some of the original sporadic fencing has been removed. We, in fact, treat that, the whole area from the Sailor's Haven Visitors Center to the boundary of Oaklyville and Point of Woods, we

8

treated that whole area as the Sunken Forest which includes, certainly, the area that was donated.

App'x at 240:11–19.

Even assuming that erecting a fence would violate the deed terms, this fleeting reference to "sporadic fencing"—which did not unambiguously refer to fencing on the deeded tracts—was not, in my judgment, sufficient to put Plaintiff on genuine notice that the deed had been violated.

B.

Defendants also argue that Plaintiff's reversionary interest is unenforceable under New York law because it was not registered within the required time window. *See* N.Y. Real Prop. Law § 345 (requiring that an intent to preserve a reversionary interest be registered "not less than twenty-seven years nor more than thirty years after" its creation). This statute does not apply, though, when both (1) the reversionary interest predates the statute's enactment in 1958 and (2) the event triggering reversion occurs after the prescribed window. *See Bd. of Educ. v. Miles*, 15 N.Y.2d 364, 373–74 (1965). Both are true here: the reversionary interest was created in 1955, and reversion would not be triggered until after 1985, when the registration window closed.

9

Defendants argue that the interest was created in 1966, when the land was conveyed to the United States, not in 1955. But it is evident that the restrictive covenant in this case was intended to run with the land. *See Malley v. Hanna*, 65 N.Y.2d 289, 292–93 (1985) (finding that a restrictive covenant will run with the land when the intent for it to do so is evident from, among other things, the same covenant being included in each successive deed). This means that the interest was created with the original covenant in 1955 and continued to bind future titleholders; no new interest was created when the land was reconveyed. *See Miles*, 15 N.Y.2d at 131 (noting the date the covenant was created, not when the land was subsequently reconveyed). This interest is therefore still enforceable, lack of registration notwithstanding.

\* \* \*

Our job here is limited. It's not to review the Plan or the findings that went into it. And it certainly isn't to question its ecological wisdom, which I wouldn't presume to do. It's to interpret the words of a seventy-year-old deed and to decide whether the United States can, as a matter of law, implement the Plan without paying just compensation for the donated land.

In my view, the best and narrowest reading of the deed prohibits sharpshooting and euthanizing deer in the Sunken Forest. But even under the interpretation credited in the majority opinion, Defendants would not be entitled to summary judgment on the record before us. I would therefore reach Defendants' other arguments and, finding them meritless, vacate the judgment.